UNITED STATES of America,
Plaintiff–Appellee,

v.

Leo G. KELLY, Defendant–Appellant.

No. 96–3102.

United States Court of Appeals,
Seventh Circuit.

Argued April 8, 1998.

Decided Feb. 12, 1999.

John W. Vaudreuil (argued), Office of the U.S. Attorney, Madison, WI, for Plaintiff–Appellee.

Robert J. Palmer, (Bobby Yeggy, Daniel Gay, Law Students), May, Oberfell & Lorber, South Bend, IN, for Defendant–Appellant.

Before COFFEY, MANION and KANNE, Circuit Judges.

COFFEY, Circuit Judge.

Defendant–Appellant Leo Kelly ("Kelly") appeals his conviction for knowingly causing the transportation of hazardous waste to a facility lacking a permit to dispose of such waste, and knowingly causing the disposal thereof without a permit, in violation of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6928(d)(1) and (d)(2), respectively. Kelly challenges the jury instructions as excluding certain statutory elements of the crimes charged and relieving the government of its burden of proof on the issue of Kelly's knowledge. We affirm.

## I. BACKGROUND

From the late 1970's through 1993, Kelly owned and operated Wisconsin businesses specializing in underground storage tank removal. Kelly's umbrella company was called Environmental Waste and Material Systems, Inc. ("EWMSI"), and removed underground petroleum storage tanks, disposed of waste materials contained therein, and remediated the sites after the tanks had been removed. The Wisconsin Department of Natural Resources ("WDNR") had granted EWMSI and Kelly a license to pick up hazardous waste from various locations and transport it only to those facilities authorized to accept such material.

In November of 1985, the WDNR conducted an administrative inspection of property owned by Kelly in Sawyer County, Wisconsin, and during its inspection, a representative from the WDNR discovered approximately 150 55–gallon barrels on the property.[1] Some of these barrels had previously been opened and their contents spilled onto the soil; others had rusted through and were leaking. The WDNR took samples from barrels at the site, performed a chemical analysis, and several of the samples were determined to be hazardous wastes by the WDNR. The WDNR advised Kelly in writing that a number of the barrels found on his property contained hazardous waste, furthermore that he did not possess the requisite permit to store such material on the premises, and that he would have to remove and transport the waste to an authorized storage facility. Initially, Kelly refused to comply with the WDNR's request that he remove the barrels from his property, but later was forced to comply after the State obtained a preliminary injunction ordering him to acquiesce in the WDNR's demands.

In 1989, a company called CCF, Inc. contacted Kelly and hired one of his businesses, Environmental Services, to remove, clean and dispose of six underground storage tanks from one of its convenience stores that it had closed in Cumberland, Wisconsin. CCF, Inc. pumped saleable product out of the tanks as best as they could before removing them, but small amounts of gasoline, heating oil and diesel fuel remained in the tanks. Waste oil, unusable sludge and water also were left in the tanks. As agreed, Environmental Services removed the tanks, pumped out the remaining contents—both usable and unusable—and filled in the land where the tanks had been buried.

Several months later, the WDNR and the Cumberland Fire Department raised environmental and safety concerns with CCF, Inc. about barrels which EWMSI had left on the convenience store premises. CCF, Inc., in turn, contacted Kelly, and instructed him to remove the barrels immediately. A representative from the WDNR recommended that Kelly transport the barrels and their contents to Waste Reclamation & Research,

---

1. As far as the record reflects, the property inspected was not the site of one of Kelly's businesses. The parcel consisted of a log home, several smaller cabins, and a metal shed.

an Eau Claire, Wisconsin, facility licensed by the Environmental Protection Agency and WDNR to accept and process hazardous materials.

Sometime in late summer or early fall of 1990, Kelly directed two of his employees, John Reese and Richard Ehn, to pick up the barrels at the CCF, Inc. convenience store, and to transport them to Winter Auto Salvage in Winter, Wisconsin, rather than the facility in Eau Claire. Per Kelly's directive, Reese and Ehn drove Kelly's pick-up truck to the convenience store, loaded the barrels onto the truck, and delivered them to Winter Auto Salvage. Samples from these barrels were later analyzed by the Environmental Protection Agency's National Enforcement Investigation Center ("EPA") and a number of barrels on the premises were found to contain a substance identified as hazardous waste as defined by RCRA. Winter Auto Salvage was not certified to accept hazardous waste.

Two years later, in the fall of 1992, Kelly instructed his son, Dan Kelly, and Ehn to transport twenty-seven barrels of waste from one of Kelly's business enterprises to Winter Auto Salvage, which Kelly knew was not an approved site to accept waste materials of this nature. Ehn believed that these barrels looked like the ones he had seen on Kelly's property in rural Sawyer County, that is, the site which had been the source of the WDNR's 1985 environmental action against Kelly. Because of the publicity that had surrounded the WDNR's investigation, Ehn advised the owner-operator of Winter Auto Salvage not to accept the drums. In spite of this suggestion, Winter Auto Salvage accepted delivery. Samples from these barrels were later analyzed by the EPA and identified as hazardous waste as defined by RCRA.

On November 1, 1995, the government charged Kelly with four violations of the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq., which governs the transportation, treatment, storage and disposal of hazardous waste. Specifically, counts one and three alleged that Kelly violated 42 U.S.C. § 6928(d)(1) by knowingly *transporting* 55–gallon drums containing hazardous waste to a facility lacking a hazardous waste permit. Counts two and four alleged that Kelly violated § 6928(d)(2) by *disposing* of 55–gallon drums containing hazardous waste at a facility not authorized to accept hazardous material for storage.

On May 30, 1996, a jury found Kelly guilty of all four counts charged in the indictment. The court sentenced Kelly to 41 months imprisonment. Kelly appeals.

## II. ISSUES

Kelly raises two issues: (1) whether the trial court properly instructed the jury on the elements of transporting and disposing of hazardous waste; and (2) whether the district court properly instructed the jury on the government's burden of proof regarding the defendant's knowledge that the substance was hazardous waste.

## III. DISCUSSION

In 1976, Congress enacted RCRA and directed that its purpose was to provide national controls on the management and disposal of hazardous waste. Kelly was charged with, and convicted of, violating the sections of RCRA which make it a federal offense to "knowingly transport[ ] or cause[ ] to be transported any hazardous waste . . . to a facility which does not have a permit" or to "knowingly treat[ ], store[ ], or dispose[ ] of any hazardous waste . . . without a permit. . . ." 42 U.S.C. § 6928.

Kelly contends that the trial judge's instructions were improper and failed to accurately explain the elements of the crime as set forth in the RCRA statute, thereby depriving him of his Fifth and Sixth Amendment rights to due process and trial by jury. Specifically, Kelly alleges that (1) the instructions failed to inform the jury that Kelly had to know the substances he transported were *wastes*; and (2) the jury could have interpreted the last sentence in the instructions as relieving the government of its burden of proof on the issue of Kelly's knowledge.

We review a trial court's instructions to the jury with great deference. *See United States v. Vang*, 128 F.3d 1065, 1069 (7th Cir.1997). When conducting this deferential review, we analyze the instructions as a whole and not piecemeal to determine if they are accurate statements of the law.

*See, e.g., United States v. Perez*, 43 F.3d 1131, 1137 (7th Cir.1994) ("this court reviews instructions in their entirety....") Primarily, we consider whether the jury instructions misled the panel in any way, and whether the jury had a complete understanding of the issues and the law applicable thereto. *See id.* (citations omitted). Instructions which are accurate statements of the law and which are supported by the record will not be disturbed on appeal. *See Vang*, 128 F.3d at 1069 (citation omitted). Moreover, even an erroneous instruction when read in its entirety will be reversed "only if the jury's comprehension of the issues is so misguided that it prejudiced the complaining party." *Id.* (quoting *United States v. Smith*, 103 F.3d 600, 606 (7th Cir.1996)) (quoting *United States v. Dack*, 987 F.2d 1282, 1284 (7th Cir.1993)).

A. *Whether the Trial Court Properly Instructed the Jury on the Elements of Illegal Transportation and Disposal of Hazardous Waste Under RCRA.*

■ At trial, Kelly put forth a "mistake of fact" defense and he attempted to establish that in spite of the fact that he had been warned and instructed to deposit the barrels at a site licensed to accept hazardous materials, he somehow mistakenly believed that the substance in the barrels was nothing but gasoline, which he admits is hazardous but, he avers, is not "waste," and thus is not governed by RCRA.[2] As such, Kelly's first argument is that the jury instructions failed to make the jury aware of the fact that it needed to find that Kelly not only knew the substances were hazardous, but also that he knew the substances were *waste*. To analyze this argument, we must set forth the "Elements of the Offense" instructions given to the jury. The illegal transportation (42 U.S.C. § 6928(d)(1)) instruction required the

government to prove beyond a reasonable doubt

first, that [Kelly] knowingly transported or caused to be transported hazardous waste; second, that [Kelly] knew the waste materials had the potential to be harmful to others or to the environment; third, that the waste materials were transported or caused to be transported to a facility that did not have a permit to treat, store, or dispose of hazardous waste; and fourth, that [Kelly] knew the facility did not have a permit to treat, store, or to dispose of hazardous waste.

The illegal disposal (42 U.S.C. § 6928(d)(2)) instruction tracked the statutory elements of the offense just as closely. Kelly admits that the "Elements of the Offense" instructions, on their own, "contained no misstatement of law." However, when read with the court's instruction defining the requisite *mens rea* element of the crime, Kelly argues, his constitutional rights were violated. The *mens rea* instruction, entitled "Knowledge of Hazardous Waste," reads:

All four counts in the indictment charge that the defendant knowingly transported and disposed of hazardous waste. The word "knowingly," as used in these instructions, means that the defendant realized what he was doing and was aware of the nature of his conduct, and did not act through ignorance, mistake or accident. Knowledge may be proved by the defendant's conduct, and by all the facts and circumstances surrounding the case. The government is not required to prove that the defendant knew the substance was identified as hazardous waste under EPA regulations. *You need only find that the defendant knew that the waste had the potential to be harmful to others or to the environment, or, in other words, that the defendant knew the waste was not an innocuous substance.*[3] (Emphasis added.)

---

2. Several courts have considered whether petroleum in various forms constitutes a hazardous waste. *See, e.g., PaineWebber Income Properties v. Mobil Oil Corp.*, 902 F.Supp. 1514, 1519 (M.D.Fla.1995) (leaked petroleum not a hazardous waste under RCRA); *Dominick's Finer Foods, Inc. v. Amoco Oil Co. and Shell Oil Co.*, 1993 WL 524808 (N.D.Ill.1993) (leaked petroleum is a solid waste under RCRA); *Recycling, Inc. v. Amoco Oil Co.*, 856 F.Supp. 671 (N.D.Ga.1993)

(leaked petroleum is a hazardous waste under RCRA); *Zands v. Nelson*, 779 F.Supp. 1254, 1262 (S.D.Cal.1991) (gasoline entering soil is no longer useful, thus it constitutes solid waste for purposes of RCRA).

3. The second and third sentences of this instruction come from the Seventh Circuit pattern jury instructions. The last two sentences were added to reflect the fact that this was a RCRA case.

Kelly believes the instructions, taken as a whole, precluded the jury from considering whether Kelly knew the substances in the barrels were *waste*.

The term "hazardous waste" is expressly defined by statute, and was explicitly incorporated into the jury instructions in a section which defined "hazardous waste" as referenced by Congress in RCRA, *see* 40 CFR §§ 261.20(a) and 261.2(a).[4] Other circuits have held that the term "knowingly" modifies the term "hazardous waste," *see, e.g., United States v. Dee*, 912 F.2d 741, 745 (4th Cir. 1990); *United States v. Hoflin*, 880 F.2d 1033, 1039 (9th Cir.1989), and this result is consistent with a plain reading of the statute. Kelly did not object to this instruction at trial.

Thus, under the explicit terms of RCRA, and under the district court's instructions, the jury was only required to find that the defendant Kelly knowingly transported a substance that fit within the parameters of the definition of "hazardous waste," as defined by Congress, not that Kelly had knowledge that the material was *hazardous*, and that he had knowledge that the material was *waste*. Kelly only had to be found guilty of transporting, and disposing of, "hazardous waste" as defined by statute. This is precisely what the jury instructions stated, and we are confident the jury had no problem understanding the law to be applied to the facts.

Kelly apparently would have us establish a rule that mandates instructions be given in a RCRA case which *divides* the term "hazardous waste" into two separate components, each with its *distinct* definition. We do not agree that this proposed division is required because Congress has enacted legislation that clearly defines the term. What is necessary is that the jury find Kelly knowingly transported "hazardous waste" as defined by RCRA, and the jury instructions accomplished that goal by defining the term according to the statutory definition. If Kelly had persuaded the jurors that he truly believed he was merely transporting gasoline, the jury instructions clearly required acquittal. The jury heard conflicting testimony on the issue of whether Kelly had knowledge of what was inside the barrels, and agreed with the government's position. It was a question of credibility for the jurors to decide, and they simply did not believe Kelly. Contrary to his assertion, however, the language of the jury instruction *neither inferred nor mandated* this result.[5]

■ We understand Kelly's desire to divide up the elements of the offense in as many subparts as possible. Nevertheless, "[c]omposing jury instructions is not a precise science; many formulations can be adequate. We [will] not overturn convictions merely because a word or two more or less theoretically could have improved the defendant's chances of acquittal." *United States v. McNeal*, 77 F.3d 938, 944 (7th Cir.1996) (citations omitted). When we examine the instructions as a whole, *see Wilk v. American Medical Assoc.*, 719 F.2d 207, 218–19 (7th Cir.1983), we are convinced that they accurately tracked the statutory language and required the jury to find that in order to be convicted, Kelly had to knowingly transport "hazardous *waste*."

B. *Whether the Trial Court Properly Instructed the Jury on the Government's Burden of Proof Regarding the Defendant's Knowledge of a Hazardous Waste Under RCRA.*

■ Kelly's second argument is that the instructions reciting the *mens rea* component of the offense—the *knowledge* component—improperly shifted the burden of proof onto Kelly and away from the government. Specifically, Kelly contends that the last sentence of the "Knowledge of Hazardous

---

**4.** 42 U.S.C. § 6903(5) defines "hazardous waste" as "a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may—(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or (B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed."

**5.** We also note that the "Knowledge of Hazardous Waste" instruction explicitly stated that in order to be convicted of acting "knowingly," Kelly *could not have been* acting "through ignorance, *mistake*, or accident." (Emphasis added.)

Waste" instruction, (italicized above), places the burden on the defendant because "once the government proved that [Kelly] was on notice that the substances were not innocuous," he affirmatively had to establish "that [he] knew the substances at issue were not hazardous wastes." Kelly would have us rewrite the statute for his benefit, but the responsibility of an appellate judge is to interpret the laws, not to re-draft them.

Initially, we note that the jury was given a separate instruction titled "Presumption of Innocence—Reasonable Doubt—Burden of Proof" which stated, in relevant part, that "[t]he government has the burden of proving the guilt of the defendant beyond a reasonable doubt, and this burden remains on the government throughout the case. The defendant is not required to prove his innocence...." This instruction explicitly mandates that the jury operate, "throughout the case," under the assumption that the government has the burden of proof.

Kelly's argument fails for more specific reasons as well. The last sentence of the "Knowledge of Hazardous Waste" instruction stated: "You need only find that the defendant knew that the waste had the potential to be harmful to others or to the environment, or, in other words, that the defendant knew the waste was not an innocuous substance." A plain reading of this sentence certainly does not suggest that Kelly had the burden of establishing that he did not know that the substance was harmful. The government is still required to establish each and every element of the crime beyond a reasonable doubt. Moreover, we recognize that several appellate courts have held that the government needs to demonstrate that the defendant knew the substance had the potential to be harmful to others or to the environment and thus was not an innocuous substance. *See, e.g., United States v. Goldsmith*, 978 F.2d 643, 645–46 (11th Cir.1992); *United States v. Hoflin*, 880 F.2d 1033, 1039 (9th Cir.1989); *United States v. Greer*, 850 F.2d 1447, 1450 (11th Cir.1988). The jury instructions given in this case comport with these holdings.

The language that Kelly finds fault with falls far short of burden-shifting. The government correctly points out that the phrases "potential to be harmful" and "not an innocu-

ous substance" are almost identical, and the phrase "not an innocuous substance" does not shift the burden of proof in our opinion. At trial, Kelly had the opportunity to establish that he mistakenly thought he was disposing of gasoline, and thus lacked knowledge that the substance in the barrels was potentially harmful. The instructions permitted the jury to find that if Kelly lacked the sufficient *mens rea*, he should be acquitted. It is the duty of the jury to apply the law to the facts; in this case, the jury seems to have accepted the government's position and found Kelly's testimony unbelievable. But this finding was not rendered because of faulty instructions; the instructions accurately paralleled the governing statute and correctly explained the law.

## IV. CONCLUSION

The judgment of the district court is AFFIRMED.