Zia U. HASHAM, Plaintiff–Appellee,

v.

CALIFORNIA STATE BOARD OF EQUALIZATION, Defendant–Appellant.

No. 98–3193.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 23, 1999.

Decided Jan. 5, 2000.

**1040**

Fern N. Trevino (argued), Chicago, IL, for Plaintiff–Appellee.

Grace Allen Newton (argued), Chicago, IL, for Defendant–Appellant.

Before COFFEY, RIPPLE and ROVNER, Circuit Judges.

COFFEY, Circuit Judge.

Zia U. Hasham ("Hasham") filed charges of discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* and the Age Discrimina-

tion in Employment Act, 29 U.S.C. § 621 *et seq.,* against his employer, the State of California Board of Equalization ("CBOE"). Plaintiff filed formal and informal complaints alleging discrimination with CBOE and also filed a charge with the Equal Opportunity Employment Commission ("EEOC"), which issued a right to sue letter on March 19, 1996. Before the EEOC and also in federal court,[1] Hasham claimed that CBOE discriminated against him based on his Pakistani national origin, his Muslim religion and also because of his age (over 40 years of age). District Court Judge William Hart granted CBOE summary judgment on the age and religion discrimination claims but allowed the claim of national-origin discrimination to proceed to trial. The jury found in Hasham's favor and awarded him back pay and compensatory damages in the amount of $350,000. On post-trial motions, the trial judge upheld the jury's liability verdict but vacated rather than reduced the compensatory damage award of $350,000 while awarding Plaintiff $15,548 in back-pay, $4,188.48 in interest, a promotion to a Supervising Tax Auditor I ("Supervisor I") position in Houston, Texas with seniority retroactive to August 1993 and attorneys fees and costs.[2] On September 3, 1998, the trial court granted the defendant's motion to stay the money judgment and order of promotion. Three months later on December 10, 1998, the court lifted the stay on Plaintiff's promotion and granted him his promotion due to a Supervisor I job opening. The defendant now appeals the district court's denial of its motion for judgment as a matter of law and motion for a new trial. CBOE also appeals the trial judge's evidentiary rulings and jury instructions. We AFFIRM.

## I. BACKGROUND

The CBOE is an administrative agency of the State of California and assumes the

---

1. The district court's jurisdiction over Plaintiff's case is based on federal subject matter under Title VII of the Civil Rights Act of 1964, as amended and 28 U.S.C. § 1343(a)(4).

2. The attorneys fees and costs awards have not been determined as a result of the district court issuing an order on September 3, 1998, staying the entry of a money judgment.

charge of auditing those businesses located outside California and doing business within California and who may be liable for payment of California sales and use tax. The CBOE out-of-state district maintains field offices in Chicago, New York and Houston. Each field office is directed by an area administrator who reports to a district administrator. Both Sidney Zigelman ("Zigelman"), the area administrator for the Houston branch office of the out-of-state district, and Bruce Henline ("Henline"), the out-of-state district administrator,[3] served from July 1991 through the time of Hasham's promotion denial.

CBOE's offices maintain four types of auditing positions in the out-of-state district offices, entry level Tax Auditor I ("Auditor I"), Tax Auditor II ("Auditor II"), Associate Tax Auditor ("Auditor III") and Staff Tax Auditor. The out-of-state district has a long standing practice of promoting all Auditor I's to Auditor II, provided they successfully complete the mandatory probationary period and meet job expectations. Similarly, there is a long standing practice of promoting all Tax Auditor II's to Tax Auditor III provided they pass the required examination and have an acceptable job performance. As CBOE's most senior tax auditing position, Staff Tax Auditor is a competitive post, requiring a promotional exam score within the top three ranks. This position has the responsibility of performing difficult and complex audits—audits of large, multi-national corporations.

Under CBOE's competitive promotion system, auditors desiring to be considered for a particular promotion must initially express an interest in the particular promotion and achieve one of the top three scores on the applicable promotional exam, which consists of both a written and an oral exam. Promotional exams are given approximately every two years and candidates who score above a minimum 70% on the exam are ranked based on their scores on an information list.[4] When a vacancy arises, the CBOE Selection Unit *certifies* a list containing the names and addresses of "eligible candidates" for the position to the appointing authority. Only those candidates who have scored in the highest three ranks on the applicable exam and initially expressed an interest in the particular position at the time the list was certified are considered "eligible candidates" (i.e., "they are 'reachable' for the vacancy"). The candidates on the certification list are then contacted a second time to determine if they are interested in that *particular* vacancy.[5] Also, CBOE's promotion policy provides that all employees, regardless of their field office location, are permitted to compete for promotions within the out-of-state district.

Plaintiff Hasham is a U.S. citizen and has been employed by CBOE since 1981 as an out-of-state district auditor in the Chicago office. He received promotions to Auditor II and III and after a competitive exam process, was promoted to Staff Tax Auditor in 1988. In 1990, Hasham took the promotional exam for a Supervisor I position, and scored the second highest exam in the Chicago office. In 1992, Hasham again took the exam and scored the

---

**3.** As the out-of-state district administrator, Henline was required to approve all promotions and hires.

**4.** It appears from the record that applicants may review the information list.

**5.** Presumably, a candidate who had scored within the top three ranks on a promotional exam and who had previously expressed an interest in the position at the time of certification of the list, may withdraw for a number of reasons, such as, the particular vacancy is in another state.

Further, Plaintiff contends that, by law, after the promotional list is certified, even if a candidate in the first rank withdraws, the promoting authority cannot then drop down and consider a candidate in the fourth rank. Defendant disputes this by arguing that under the statute, candidates must indicate "their willingness to accept appointment under the conditions of the employment specified" in order to be considered within the "three highest ranks."

highest among the Chicago, New York and Houston offices. He also passed the Supervising Tax Auditor II ("Supervisor II") exam, which tests for knowledge and skills above what is tested on the Supervisor I exam. As a result, Hasham's name appeared on the Houston office certification lists in 1991 and 1992.

In July 1993, a Supervisor I position in the Houston office became available and at the time, Brian Wiggins ("Wiggins"), Hasham and Steve Smith ("Smith") were ranked within the top three ranks on the applicable certification list, 1, 2 and 3, respectively. During the first week of August 1993, Hasham called Zigelman to inquire about the Supervisor I position. During the conversation, Hasham advised Zigelman that he had three school-age children and inquired about the quality of the Houston public schools. Hasham asserts that after the conversation, Zigelman criticized his Indian/Pakistani accent to a fellow Houston employee[6] and said that Hasham was worrying about the Houston schools "as if he would get the job."[7]

On August 18, 1993, Zigelman participated in a phone interview with Hasham that lasted but a few minutes with Zigelman asking only a few general questions. Despite the fact that Zigelman admitted at trial that Hasham's performance in the job interview was "excellent," Hasham did not receive the promotion. Instead, Smith, a white auditor in the Houston office, was selected.

6. James Zoes testified that Zigelman stated, "If you really want to hear something difficult, you should have heard that guy from Chicago. He was extremely difficult to understand. In fact, how did he expect to be a supervisor if he can't communicate with people." (Tr. at 430–31.)

7. Gregory Joseph (Tr. at 420–21).

8. Audits that remained uncompleted after six months.

9. It appears that the parties and the trial court did not consider Wiggins, a white candidate with the highest score, a serious con-

## A. Qualifications of Hasham and Smith

Hasham scored an 87 on the Supervisor I exam while Smith scored an 83. Hasham has a Bachelor of Arts degree from the University of Karachi, Pakistan, and a Bachelor of Science degree in Business Administration and a Masters of Science degree in Accounting from Roosevelt University in Chicago. At the time of the promotion at issue, Hasham had informed Zigelman that he was a certified public accountant ("CPA"), while Smith on the other hand, had a Bachelor's degree in accounting but was not qualified as a CPA.

According to Zigelman's testimony at trial, prior to his promotion of Smith, every supervisor in the Houston office was a CPA. Further, as of September 1993, Hasham had twelve and one-half years of tax auditing out-of-district accounts experience in contrast to Smith's six years. Moreover, Hasham had completed several difficult and large "mega" audits (audits of large multi-national corporations) for CBOE, while Smith had yet to complete even one as of September 1993 and had more aged audits[8] than Hasham. Also, prior to recommending Smith for the promotion, Zigelman contacted Lynn Thompson, Hasham's supervisor at the time, and received a favorable reference.

## B. Zigelman's Promotion Decision

Zigelman recommended Smith for the Supervisor I position and district administrator Henline concurred.[9] Zigelman, in

tender for the Houston Supervisor I promotion. As the district court pointed out on the motion for summary judgment, Zigelman, as the decision maker, apparently did not seriously consider Wiggins for the promotion because Wiggins had previously declined a promotion to the Houston office and was in line for a better promotion in the Sacramento office. Although Zigelman disputes that these factors influenced his decision, a jury could have reasonably found that Wiggins was not a serious contender for the Supervisor I promotion at issue.

an affidavit filed with the trial court, claimed that he chose Smith for four reasons: (1) he worked with Smith personally and knew the quality of his work firsthand; (2) experience did not play a major role in the ultimate promotion decision because the candidates were equally experienced; (3) he preferred to promote from in-house to improve worker morale; and (4) he wanted to retain another employee, Carol Cross ("Cross") who caused the vacancy by requesting a voluntary demotion. In making his decision, Zigelman admitted that he did not consider the complexity of the audits that the respective candidate had responsibility for nor did he consider Hasham's superior experience to that of Smith. He also stated that he did not take into account that Hasham had been asked to train new auditors, teach a law class or temporarily fill in for a supervisor. Further, prior to 1993, Zigelman on two occasions had an opportunity to make promotions to supervisory positions: Carol Cross and Joe Clayton.[10]

Following Smith's promotion, Hasham filed his discrimination claim with the EEOC and thereafter with the district court. After a jury trial, Hasham was awarded back pay and compensatory damages. On post-trial motions, the trial judge upheld the jury's liability verdict while vacating the compensatory damages award and awarded Plaintiff $15,548 in back pay, calculated from the date of his promotion denial, $4,188.48 in interest, the Supervisor I promotion with seniority, calculated from the date of his promotion denial, and attorneys fees and costs. Defendant CBOE appeals.

## II. ISSUES

On appeal, Appellant CBOE argues that the record fails to lend support to a finding of intentional national-origin discrimination; the district court committed revers-ible error in its evidentiary rulings and jury instruction; and the jury's verdict was based upon passion and prejudice.

## III. DISCUSSION

### A. Intentional National Origin Discrimination

■■■ CBOE argues that the record fails to support the jury's finding of intentional discrimination. Noting that the trial court denied CBOE's motion for a judgment as a matter of law on these grounds, we interpret Appellant's issue presented for review as a challenge to the court's denial which we review *de novo*. See *Williams v. Pharmacia*, 137 F.3d 944, 948 (7th Cir.1998). This Court is limited to deciding only whether the evidence presented at trial, with all the reasonable inferences drawn there from, "is sufficient to support the verdict when viewed in the light most favorable to the [plaintiff]." See *Collins v. Kibort*, 143 F.3d 331, 335 (7th Cir. 1998). We will overturn a jury verdict for the plaintiff only if we conclude that "no rational jury could have found for the plaintiff." See *Emmel v. Coca–Cola Bottling Co.*, 95 F.3d 627, 629(7th Cir. 1996). Indeed, this standard is applied "stringently in discrimination cases where witness credibility is often crucial." *Williams*, 137 F.3d at 948.

■■■ Hasham's discrimination claim arises under 42 U.S.C. § 2000e–2(a), which makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... national origin." 42 U.S.C. § 2000e–2(a). CBOE denies that Hasham's national origin played a role in its decision to promote Smith over him and claims that it promoted Smith for performance and business reasons wholly unre-

---

10. The trial judge limited evidence regarding Zigelman's and Henline's practice of promoting minorities to the time frame between 1991 and 1993 and to the positions of Supervisor and Staff Tax Auditor. (Tr. at 277–81.) Under this restriction, Hasham presented fur-ther evidence that as a result of promotions and hires during Henline's tenure, out of 31 supervisory positions in the out-of-state district offices during the period from 1992 to 1993, only two were held by non-whites. (Tr. at 414.)

lated to Hasham's national origin. The two accepted ways of establishing that an employer violated this prohibition are: first, by direct evidence (taking the form of, "I did not promote you because of your national origin") or second, indirect evidence. *See Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir.1994). Because employers are usually careful not to offer smoking gun remarks indicating intentional discrimination, the Supreme Court established the burden shifting approach as a means of evaluating indirect evidence of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Even so, the elements of proof in an employment discrimination case need not be "rigid, mechanized, or ritualistic." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). Thus, this Circuit has also held that a combination of direct and circumstantial evidence, "none conclusive in itself but together composing a convincing mosaic of discrimination against the plaintiff," may allow a plaintiff to surpass the summary judgment hurdle. *See Troupe*, 20 F.3d 734, 737 (7th Cir.1994). Nonetheless, the *McDonnell Douglas* burden shifting framework provides "a useful organizational structure under which the parties and the . . . court can assess the need for a full trial." *See Sattar v. Motorola*, 138 F.3d 1164, 1169 (7th Cir.1998).

■■■ Under the burden shifting method, the plaintiff must initially establish a prima facie case of unlawful discrimination demonstrating that he or she is in a protected class, qualified for the promotion, did not receive the promotion despite his or her qualifications and that a person not in the protected class was promoted instead (or other such evidence from which one can infer that the employment action was taken for an impermissible purpose). *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Leffel v. Valley Financial Services*, 113 F.3d 787, 793 (7th Cir.1997). Defendant CBOE does not claim that Hasham failed to establish this. Once the plaintiff has established his prima facie case, an inference of discrimination is created and the defendant has the burden to "clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Center*, 509 U.S. at 507, 113 S.Ct. 2742 (emphasis and quotations omitted). Should the defendant do so, the inference of discrimination disappears and the plaintiff must then demonstrate by a preponderance of the evidence that the reasons proffered by the defendant were pretextual for intentional discrimination. *See id.* However, on post-trial review, whether Plaintiff's case is based on direct or indirect evidence, the *McDonnell Douglas* framework drops out of the analysis and we need only consider whether the record supports the resolution as to the ultimate question of intentional discrimination. *See Collins*, 143 F.3d at 335.

### 1. Discriminatory Comments

■■■ It was revealed at trial that sometime around the month of August 1993, Zigelman made a comment to one of the auditors in the Houston office about the foreign accent of an auditor from the New York office named D. Patel. Zigelman said that Patel was difficult to understand and then remarked about Hasham, "If you want to hear something difficult, you should have heard that guy from Chicago. He was extremely difficult to understand. In fact, how did he expect to be a supervisor if he can't communicate with people." Another Houston auditor also testified that he heard Zigelman on another occasion state in a demeaning tone that he could not understand Hasham. However, Zigelman did testify at trial that there was "absolutely" no reason to believe that Hasham's accent would interfere with his ability to supervise. (Tr. at 150.) Also, in February 1992, Ruth Malloy and Pamela Hartman, two auditors in the Houston office, testified that they heard Zigelman say

that he did "not want to hire any more foreigners" after he was told that an Asian applicant was waiting to be interviewed. (Tr. at 487, 496.) We are of the opinion that a reasonable jury could have concluded that, in conjunction with Zigelman's contradictory testimony, his comments about Hasham's accent and comment about the hiring of foreigners demonstrated a discriminatory animus that governed his promotional decision, which we are in no position, "particularly ... in employment discrimination cases[,] to ... supplant[ ] our view of the credibility or weight of the evidence for that of ... the jury." *Hybert v. Hearst Corp.*, 900 F.2d 1050, 1054 (7th Cir.1990).

### 2. Evidence of Pretext

■■■■ Defendant argues that Smith was promoted for the following reasons: Zigelman believed that Smith was the most qualified candidate; to continue promoting in-house employees; and to accommodate Carol Cross's voluntary demotion. Obviously, it is the prerogative of the jury to weigh and balance the credibility of each and every witness and disbelieve or believe any or all reasonable testimony and evidence offered to support an employment decision. *See Emmel*, 95 F.3d at 633–34. A jury may also reasonably find the "proffered nondiscriminatory reason pretextual and that the real reason was in fact unlawful discrimination." *Id.* at 634 (citing *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817). In other words, pretext is "a lie, specifically a phony reason for some [employment] action" by the employer. *Perdomo v. Browner*, 67 F.3d 140, 144–45 (quoting *Russell v. Acme–Evans Co.*, 51 F.3d 64, 68 (7th Cir.1995)). Pretext does not require that plausible facts presented by the defendant not be true, only that they not be the reason for the employment decision. *See Emmel*, 95 F.3d at 634. Indeed, circumstantial evidence can be offered to prove that Defendant's purported reasons for the promotion decision are not worthy of belief and thus pretextual. *See Huff v. UARCO*, 122 F.3d

374, 380 (7th Cir.1997). As we have previously stated,

> [Plaintiff's] circumstantial evidence was not presented in vain, however, for it can be used at the pretext stage of the *McDonnell Douglas* test to demonstrate the ultimate fact of discrimination. Bearing this in mind, our task is to determine whether [Plaintiff] has come forward with sufficient evidence from which a trier of fact could reasonably infer that [her employer] denied her training or promotion on the basis of her race or national origin....

*Pafford v. Herman*, 148 F.3d 658, 666 (7th Cir.1998). Similar to the criminal law context, because "it is [often] so unlikely that direct evidence will be available," *United States v. Ranum*, 96 F.3d 1020, 1026 (7th Cir.1996); *accord Emmel*, 95 F.3d at 629 ("[E]mployers are usually careful not to generate such [direct discrimination] evidence ...."); *Castleman v. Acme Boot Co.*, 959 F.2d 1417, 1420 (7th Cir.1992) (noting that direct evidence of intent to discriminate is rarely found), we are of the opinion that there should be "nothing novel about establishing [intentional discrimination] through the use of circumstantial evidence, for ... circumstantial evidence is not less probative than direct evidence, and, in some cases is even more reliable." *United States v. Griffin*, 150 F.3d 778, 785 (7th Cir.1998) (citations and quotations omitted).

From a review of the record, it seems evident that the testimony at trial raised substantial credibility issues relating to Zigelman's often contradictory proffered reasons for promoting Smith instead of Hasham. At deposition, Zigelman testified that he believed that Smith, as a supervisor, would relate well to the staff. On the other hand, a number of other Houston employees contradicted Zigelman's testimony and stated that Smith stayed to himself and thus, rarely interacted with people. (Tr. at 424–25, 497.) Smith even admitted that after two years on the job, he had yet to learn all the names of the

Houston auditors. (Tr. at 441.) Further, Zigelman testified at trial that Hasham would make a very good supervisor and do a comparable job to Smith, had an "excellent" interview for the position and had a favorable reference from his supervisor (Tr. at 148.) In spite of this testimony, on cross examination, Zigelman testified that one of the reasons he disfavored Hasham was because he was an "unknown quantity." (Tr. at 249–50.)

Furthermore, it is interesting to note that Zigelman asserted in his affidavit that even though there was not a significant difference inexperience between the candidates, he still believed that Smith was the most qualified candidate. On the other hand, Hasham had a higher exam score than Smith, double the years of experience working for the out-of-state district, more than double the years of experience as a Staff Tax Auditor and even passed the Supervisor II exam. (Tr. at 147–55.) Further, at the time of his decision, Zigelman was aware that Hasham was a CPA and Smith was not. (Tr. at 155.) Zigelman also was aware that Hasham had substantially more experience working on complex mega audits. (Tr. at 200–04.) At deposition, Zigelman even admitted that Hasham was more qualified than Smith when considering individual job-related factors, such as education, exam score and years of experience. Although this Court has consistently held that courts should not sit as a super personnel department and second-guess an employer's personnel decision, *see Brill v. Lante Corp.*, 119 F.3d 1266, 1272 (7th Cir.1997), these facts certainly put into question Zigelman's credibility as a witness and his proffered denial of any major difference in experience between the candidates, as well as his belief that Smith was the most qualified candidate.

Zigelman also stated that although Hasham had superior auditing skills and experience, Staff Tax Auditing skills and experience were not controlling qualifications for a supervisory position. (Tr. at 148–53.) However, Zigelman admitted that a Supervisor I oversees the mega audits performed by Staff Tax Auditors and explains complex tax law issues to corporate taxpayers. (Tr. at 152–53.) Indeed, the qualifications for Staff Tax Auditor and Supervisor I, in particular the communication, supervisory and leadership skills, were identical, admitted Zigelman. (Tr. at 153–54.)

Even though CBOE argues that Zigelman's decision was based, in part, on his desire to promote "in-house" from the Houston office to boost moral, CBOE has failed to point to any evidence in the record of such policy. In fact, the record reflects that CBOE has rarely promoted from within the Houston office, as evidenced by the fact that most of the senior staff members of the Houston office received their promotions as a result of transfers from other offices. (Tr. at 181–84.) Even as an unspoken policy, CBOE contradicts itself on this assertion on several occasions because the record evidences that it has promoted outside candidates over in-house candidates. (Tr. at 404.) Indeed, it appears that only after Hasham filed his complaint did Zigelman come up with the idea that he preferred to promote in-house. (Tr. at 305–06.)

CBOE further maintained that Smith was promoted so that it could retain Carol Cross. In contrast, evidence was presented at trial that established that Henline had full authority to create a position for Cross with or without promoting Smith. (Tr. at 341–42.) Also, Zigelman offered testimony in his affidavit stating, in essence, that he thought so highly of Smith's qualifications that he would have promoted him regardless of his desire to keep Carol Cross on staff. Again, when considering Zigelman's testimony in its totality, the jury might very well have considered his proffered reasons for his promotion decision suspect and thus, unreliable.

### 3. Other Circumstantial Evidence of Pretext

Indeed, the trial record is replete with Zigelman's contradictory statements to the

jury. At deposition, he testified that according to the California merit system, he was obligated to recommend the most qualified candidate. Conversely, at trial, Zigelman stated that although the merit system mandates that the most qualified candidate be promoted, he was not required to. (Tr. at 144–45.) He made the assertion without any explanation, or much less citing any specifics or examples, but only that his altered testimony was based on "literature" that he had read since his deposition, which he believed suggested that there is no firm requirement that the most qualified person be promoted. (Tr. at 145.) Indeed, despite his deposition testimony, Zigelman was steadfast in his statements at trial that when he promoted Smith over Hasham, he was not required to promote the most qualified candidate. (Tr. at 145–46.) Accordingly, the jury could have reasonably found that Zigelman did not follow CBOE promotion policy, or, at the very least, again found Zigelman's explanation incredulous.[11]

At trial, Zigelman also testified that during the phone interview with Hasham, he asked him questions to determine whether his qualifications were superior to that of Smith. (Tr. at 156–57.) At the deposition, however, Zigelman testified that during Hasham's telephone interview, he asked "[n]ot a single question" to determine his qualifications. (Tr. at 159.)[12] Indeed, Zigelman's failure to express consistent explanations at trial or deposition could compel a jury to find that his proffered reasons for promoting Smith were

pretextual for something much more invidious. *See also Perfetti v. First Nat. Bank of Chicago*, 950 F.2d 449, 456 (7th Cir. 1991) ("If at the time of the adverse employment decision the decision maker gave one reason, but at the time of the trial gave another reason which was unsupported by the documentary evidence the jury could reasonably conclude that the new reason was a pretextual after-the-fact justification.") We also are aware that Zigelman was the decision maker relating to the promotion and thus, his credibility, which was thoroughly impeached, was crucial to this case.

 As we have previously stated,

[W]e will not second-guess a jury on credibility issues. While this court's review is confined to the "cold pages" of an appellate transcript, the jury had an opportunity to observe the verbal and non-verbal behavior of the witnesses, including the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements.... [I]t is not the task of this appellate court to reconsider the evidence or assess the credibility of the witnesses.

*United States v. Hickok*, 77 F.3d 992, 1006 (7th Cir.1996) (citations and quotations omitted). Being "particularly careful in employment discrimination cases to avoid supplanting our view of the credibility or weight of the evidence for that of both the jury (in its verdict) and the judge (in not

---

11. Further, Defendant, in essence, presented the jury with two contradictory and suspect lines of argument: (1) Zigelman promoted Smith because he was the most qualified, or (2) because Zigelman was not required to promote the most qualified candidate, he was able to promote Smith. Again, a jury could have reasonably found that each alternative contradicted either the trial evidence relating to Smith's qualifications or CBOE's promotion policy, respectively.

12. Hasham contends that Zigelman was obligated to promote one of the candidates from the top three ranks at time of certification and that at certification, Smith was the fourth

ranked candidate. Defendant responded by contending that Zigelman properly moved Smith up into the top three ranks because one of the candidates was not interested in the Houston promotion. Although the parties dispute the proper interpretation of CBOE's promotions regulation, Zigelman felt compelled to make handwritten changes to Smith's rank to show that he, on paper, followed the ranking requirement. (Tr. at 296.) Nonetheless, the jury was free to weigh all the evidence relating to pretext, including Zigelman's admission that he did not feel obligated to make any such handwritten changes to the ranks of any other certification lists. (Tr. at 296).

interfering with the verdict)," *Hybert,* 900 F.2d at 1054, we hold that CBOE was not entitled to judgment as a matter of law because, when viewing the evidence in the light most favorable to the plaintiff as we must, we conclude that a rational jury could have found that CBOE intentionally discriminated against Hasham on the basis of his national origin. *See Williams,* 137 F.3d at 948–49.[13]

## B. The District Court's Evidentiary Rulings

■■■ Defendant CBOE contends that the district court committed reversible error when it made the following evidentiary rulings: (1) admitted evidence of Smith's aged audits;[14] (2)admitted evidence of Hasham's prior promotions; (3) admitted Zigelman's alleged comments regarding the "hiring of foreigners" and Hasham's accent; and (4) admitted and denied various other evidence. We give the trial court's evidentiary rulings special deference and will overrule them only for an abuse of discretion. *See United States v. Zizzo,* 120 F.3d 1338, 1351 (7th Cir.1997). But, we do not alter a district court's judgment every time we conclude there is an abuse of discretion in the admission of evidence. *See United States v. Wimberly,* 60 F.3d 281, 286 (7th Cir.1995). Indeed, "[n]o error in either the admission or the exclusion of evidence ... is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court *inconsistent with substantial justice.*" Fed. R.Civ. P. 61 (emphasis added); *see Old Republic Ins. Co. v. Employers Reinsurance Corp.,* 144 F.3d 1077, 1082 (7th Cir.1998); *United States v.*

*Saunders,* 973 F.2d 1354, 1359 (7th Cir. 1992). A trial judge's evidentiary errors satisfy this standard only if a significant chance exists that they affected the outcome of the trial. *See Collins v. Kibort,* 143 F.3d 331, 339 (7th Cir.1998).

### 1. Smith's Aged Audits

■■■ CBOE claims that Smith's monthly time reports reflecting his aged audits are irrelevant because Zigelman did not base his promotion decision on the number of aged audits of each candidate. Thus, the defendant argues, the only evidentiary value of Smith's audits is to show that Hasham was more qualified. Again, Defendant is correct in pointing out that this Court has consistently avoided stepping into the role of a super-personnel department and second guessing legitimate personnel decisions. *See Brill v. Lante Corp.,* 119 F.3d 1266, 1272 (7th Cir.1997); *Rand v. CF Industries, Inc.,* 42 F.3d 1139, 1146 (7th Cir.1994). However, CBOE claims that Zigelman knew the quality of Smith's work product and work habits, and still believed that Smith was the most qualified candidate. Smith's work performance, as evidenced in part by his monthly time reports, represents one of the criteria that Zigelman allegedly based his promotion decision on. Because these reports reflect that even though CBOE expected that audits "be completed within nine months[;]" in 1993, "Smith alone had some five or six aged audits" not completed within nine months. (Tr. at 206–07.) Indeed, they are probative of whether Zigelman was in fact "very impressed with the quality of [Smith's] work" and consequently, whether this proffered reason was pretextual for

---

13. As previously discussed, Defendant also argues that the jury is not a super-personnel department that should second guess CBOE's alleged failure to promote the most qualified candidate. Although CBOE correctly describes this Circuit's previous holdings, Appellant's argument, however, is inapplicable to this Court's instant inquiry because, as discussed above, on post-trial appeal, "we consider only whether the record supports the resolution of the ultimate question of inten-

tional discrimination." *Piraino v. International Orientation Resources, Inc.,* 137 F.3d 987, 990 n. 1 (7th Cir.1998).

14. The monthly time reports reflect the status of each auditor's assignments. At trial, Zigelman admitted that he spoke to Smith on a number of occasions about the high number of audits he had yet to complete after nine months. (Tr. at 206–07.)

discriminatory intent. *See Emmel,* 95 F.3d at 633. Smith's monthly time reports, along with Zigelman's acknowledgment that he spoke to Smith "many times" about his unacceptable number of aged audits, (Tr. at 207), contradicted Defendant's above assertion about the quality of Smith's work[15] and was thus relevant as indirect discrimination evidence. Accordingly, we hold that the trial court did not abuse its discretion when it admitted evidence of Smith's tardiness in the completion of his audits.[16]

### 2. Evidence of Prior Promotions

■ CBOE contends that the district court erred when it allowed Hasham to testify about prior promotions that Zigelman was not involved in. Hasham testified that despite receiving the second highest score on the supervisor promotional exam in 1990 and the highest score in the Chicago, New York and Houston offices on the 1992 exam, a Supervisor I position was filled without announcement in 1991 and Hasham was passed over for a vacancy in Chicago in 1992 in favor of a less qualified American-born Caucasian. Although Zigelman was not involved in the 1991 and 1992 promotion decisions, Henline was the approving official for these and the instant promotion. Consequently, Henline's prior promotional decisions were relevant as circumstantial evidence of discriminatory conduct by Defendant in the instant promotion. Accordingly, we are of the opinion that the district court's decision to admit this evidence did not rise to the level of an abuse of discretion.[17]

### 3. Prejudicial Comments

CBOE, covering all of its tracks, also alleges that the testimony by Houston employees about Zigelman's alleged discriminatory comments were inadmissible stray remarks. Zigelman's two comments at issue, occurring on different occasions, are that he did "not want to hire any more foreigners" and, stated in a demeaning tone, he couldn't understand Hasham's accent.

■ In relation to the statement about foreigners, Defendant contends that the statement occurred 18 months prior to the promotion at issue and thus, was too remote in time and bore no relationship to Hasham because it dealt with hiring and not promoting. CBOE also asserts that Zigelman's comment that he couldn't understand Hasham's accent, allegedly stated in a demeaning tone, is too ambiguous to prove intentional discrimination. Defendant's argument might have some merit if this was solely a direct proof case because remarks must indeed be related to the employment promotion decision to evidence discriminatory intent. *See Monaco,* 1 F.3d at 660. However, because Hasham presents his case through "indirect" evidence, remarks relied upon need only be probative of discriminatory bias when determining, along with other evidence, if Zigelman's proffered reasons for promotion were pretextual. *See Huff,* 122 F.3d at 385. Further, when evaluating the probative value of Zigelman's statements, his remarks do not stand alone; in an

---

**15.** It appears that Hasham had an acceptable number of aged audits.

**16.** Hasham also claims that CBOE waived the issue of the admissibility of Smith's monthly time reports by not challenging the pretrial order through a motion *in limine.* However, the record reflects that, at a pretrial hearing, CBOE orally objected to including the monthly time reports in the pretrial order. Nonetheless, we need not resolve this issue in light of the above discussion dealing with the time reports' probative value vis-a-vis pretext.

**17.** Further, Defendant contends that evidence of possible discriminatory conduct that is time-barred is inadmissible. CBOE bases its claim on *Rush v. Scott Specialty Gases,* 113 F.3d 476 (3d Cir.1997), which found that untimely failure to promote claims prejudice timely claims and the computation of damages, and *Dasgupta v. University of Wis.,* 121 F.3d 1138 (7th Cir.1997), which involved an untimely continuing violation claim. However, because Hasham has neither based his claim on a continuing violation argument nor sued based on not receiving those prior promotions, we find CBOE's argument misplaced.

indirect proof case, "no one piece of evidence need support a finding of" discrimination, but rather the court must take "the facts as a whole." *Futrell v. J.I. Case*, 38 F.3d 342, 350 (7th Cir.1994). The remark is only but a part of a pattern of falsehoods, contradictions and discriminatory statements by Zigelman that, as a whole, convincingly demonstrate intentional discrimination. Thus, Defendant's distinctions between "hiring" and "promoting" and the 18 months separating the "foreigners" remark and the promotion in question are unpersuasive when considering the remark in conjunction with the aforementioned evidence of pretext.

 With regard to Zigelman's remark about Hasham's accent, Zigelman also testified that he had no reason to believe that Hasham's accent would interfere with his ability to supervise. (Tr. at 150.) When contrasted with Zigelman's tone and comment that he was not able to understand Hasham's accent and could not see "how did [Hasham] expect to be a supervisor if he can't communicate with people," (Tr. at 431), again, serious credibility issues for Defendant's main witness, Zigelman, are raised, which could very likely have been one of the foundation blocks for the jury's clear finding of intentional discrimination. Also, as the district court pointed out, the "accent" comment supports an inference of discriminatory intent, *see Huff*, 122 F.3d at 385, because accent is generally recognized as a manifestation of national origin and the comment was uttered by the decision maker in this case. Accordingly, we are of the opinion that the trial judge did not abuse its discretion by admitting the remarks which allowed the jury to weigh their significance. *See Partington v. Broyhill Furniture Indus., Inc.*, 999 F.2d 269 (7th Cir.1993).

### 4. Miscellaneous Evidentiary Rulings

 Defendant also challenges various other evidentiary rulings of the trial court. The conduct of a trial and rulings on evidence, motions and trial direction, are subject to the sound discretion of the trial court. *See United States v. Doyle*, 121 F.3d 1078, 1093 (7th Cir.1997). Absent manifest abuse, a district court has and must have wide discretion over the scheduling and administration of a trial. *See United States v. Murvine*, 743 F.2d 511, 514 (7th Cir.1984). The trial court allowed Hasham to testify that Lynn Thompson, his supervisor in 1993, said that she believed that Hasham was more qualified than the other candidates, and also about his impressions relating to the 1992 Carol Cross promotion. Because the record reveals that Defendant's line of questioning opened the door to such testimony, (Tr. at 104), there was no abuse of discretion by the trial judge. Likewise, we are convinced that the trial court's admission of the testimony of Smith's co-workers focusing on Smith's work performance, which rebutted Zigelman's proffered reasons for the promotion and suggested pretext, was proper. Further, because of the wide latitude necessarily afforded trial judges on relevance rulings, *see Zizzo*, 120 F.3d at 1351, we also refuse to hold that the denial of the following evidence offered by Defendant was an abuse of discretion: Smith's performance evaluation, testimony of a non-decision maker as to the meaning of the ranking regulations, Henline's belief that Zigelman's reasons were valid, and Hasham's failure to mitigate his damages. Finally, the trial court's decision not to allow the introduction of purported evidence of Zigelman's non-discriminatory animus in his pre–1991 promotional decisions also does not manifest abuse. The trial judge's exclusion of testimony regarding Zigelman's friendly interaction with an employee of Iranian decent, an employee married to an Iranian, and exclusion of a photograph from his son's bar mitzvah picturing "minority" friends, was proper because of the apparent prejudice and lack of relevance to the case such evidence demonstrates. Accordingly, we hold that the district court did not abuse its discretion in its evidentiary rulings.

### C. Jury Instruction

 Defendant next contends that the district court improperly denied its

offered jury instructions on the issues of pretext, stray comments and time barred evidence. Our review of a trial judge's jury instructions is limited to determining whether, as a whole, the instructions were sufficient to properly inform the jury of the applicable law. *See Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1350 (7th Cir.1995). The review consists of two parts: the first question to be answered is whether the instructions misstate or insufficiently state the law. *See Maltby v. Winston*, 36 F.3d 548, 560 (7th Cir.1994). If they do, we next tackle the question of whether the flawed instruction "confused or misled the jury causing prejudice to a litigant." *Doe v. Burnham*, 6 F.3d 476, 479 (7th Cir.1993). "[I]nstructions 'which are accurate statements of the law and which are supported by the record will not be disturbed on appeal.'" *United States v. Vang*, 128 F.3d 1065, 1069 (7th Cir.1997) (citation omitted). However, even an erroneous instruction will be reversed "only if the jury's comprehension of the issues is so misguided that it prejudiced the complaining party." *Id.* (quoting *United States v. Smith*, 103 F.3d 600, 606 (7th Cir.1996) (quotation omitted)).

■ Indeed, "we review a trial court's instructions to the jury with great deference." *See United States v. Kelly*, 167 F.3d 1176, 1178 (7th Cir.1999) (citation omitted). When conducting this deferential review, litigants often "rephrase and reframe the testimony to their benefit and take jury instructions out of context when making their appellate arguments." *United States v. Mancillas*, 183 F.3d 682, 707 (7th Cir.1999). Thus, we analyze the jury instructions as a whole and not piecemeal to determine if the applicable instruction is an accurate recitation of the law. *See id.*; *United States v. Liporace*, 133 F.3d 541, 545 (7th Cir.), *cert. denied*, 523 U.S. 1131, 118 S.Ct. 1823, 140 L.Ed.2d 959 (1998).

■ Defendant does not argue that the trial judge's instructions were contrary to law or unsupported by the record. Instead, CBOE argues that the trial judge should have included CBOE's proposed instructions. First, CBOE offered its version of a *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), instruction that charged the jury that "even if they find that the reasons presented by the defendant were not the real reasons, the true reasons for their decision, that they do not then have to find for the plaintiff." (Tr. at 467.) The trial judge rejected the proposed instruction as argumentative because it was phrased as a negative instruction. (Tr. at 468.) Further, even though CBOE's proposed instruction was not entirely supported by *Hicks*,[18] "a judge [also] need not deliver instructions describing all valid legal principles." *Gehring v. Case Corp.*, 43 F.3d 340, 343 (7th Cir.1994). Rather than describing each possible inference of the evidence, the judge may and usually should leave the subject of the interpretation of the evidence to the argument of counsel. *See United States v. Sblendorio*, 830 F.2d 1382, 1391 (7th Cir. 1987). Here, after review of the record, we are convinced that the trial judge issued a balanced and fair instruction that accurately stated the law. Indeed, the court graciously allowed Defendant's lawyer to ask the jury to draw the inference expressed in his proposed instruction. (Tr. at 468.)

■ Defendant also requested that a stray discriminatory comments instruction be given: comments which are not based on national origin or which cannot be reasonably interpreted as national-origin slurs or derogatory comments, do not constitute national origin discrimination and that evidence of a decisions maker's occasional or

---

**18.** *Hicks* held that a plaintiff who has withstood the defendant's motion for summary judgment and has not been able to obtain summary judgment for himself and must therefore go to trial, can ask the jury to infer discrimination from the defendant's failure to present a credible explanation for why it terminated the plaintiff's employment and replaced him with a member of a nonprotected group. *See Hicks*, 509 U.S. at 507, 113 S.Ct. 2742.

sporadic use of stereotypical remarks is generally insufficient, without more, to establish a Title VII violation. (Tr. at 520.) CBOE also requested that the trial judge instruct the jury that such remarks must be related to the employment decision and remarks that are too remote in time or are ambiguous cannot be evidence of discrimination. (*Id.*) Again, the district court declined to include these instructions because they were improper as written and created the appearance that the trial judge was commenting on the evidence. (Tr. at 521.) Instead, consistent with his evidentiary rulings,[19] the judge stated that the derogatory comments were made by Zigelman, the decision maker for the promotion. (Tr. at 521.) Nonetheless, the trial judge exercised proper discretion by allowing Defendant's attorney to make the argument to the jury. (*Id.*)

▉ Finally, Defendant contends that the trial court should have instructed the jury that CBOE cannot be held liable for any acts that transpired before March 1993, 300 days prior to Plaintiff filing his charge with the EEOC under 42 U.S.C. § 2000e–5(e)(1). CBOE was concerned that the jury would assign liability for previous employment acts that were presented by Hasham as circumstantial evidence of discrimination. The trial judge declined to include the instruction because the proposed instruction improperly discussed statute of limitation problems and Hasham was not claiming relief for CBOE's prior employment decisions. (Tr. at 521–22.)[20] Instead, the court allowed Defendant's counsel to make the distinc-

tion in closing argument and also expressed its willingness to issue the instruction should Plaintiff's attorney argue for relief for those prior non-promotions. (Tr. at 522–23.) Defendant does not contend that Plaintiff's counsel made such an argument.

CBOE does not challenge that the final jury instructions were unsupported by the record or the law, *see Vang*, 128 F.3d at 1069, but rather, that the court should have included its proposed additions. In each of the district court's denials, Defendant was allowed to raise to the jury's attention the inferences referred to in its proposed instructions in closing argument. *See Sblendorio*, 830 F.2d at 1391. Accordingly, because the trial court's jury instructions were supported by the record and were a fair and accurate recitation of the law, we are convinced that there is no reason to disturb the trial judge's denials of Defendant's proposed additions to the instructions. *See Kelly*, 167 F.3d at 1178.

## D. The Jury's Verdict

▉ It appears that CBOE argues that the district court erred when it denied CBOE's motion for a new trial.[21] Defendant contends that the liability verdict was unsupported by the record and based on passion because the jury awarded Plaintiff $350,000 in compensatory damages without any supporting evidence. This Court reviews the district court's denial of the motion for a new trial for "clear abuse of discretion," *see Emmel*, 95 F.3d at 636, by looking to see if "the verdict is against the

---

19. As previously discussed, we hold that the trial judge properly admitted Zigelman's comments relating to the hiring of foreigners and Hasham's accent.

20. As previously discussed, Defendant's argument that evidence of time-barred discriminatory conduct is inadmissible is inapplicable here because Plaintiff has neither based his case nor sued on a continuing violation claim.

21. Throughout its briefs, Defendant formulates the issues presented for review poorly. CBOE presents this question for review as

whether the jury's verdict was based upon passion and prejudice, and thus should be reversed. Framing the issue and its accompanying discussion in such a way is uninstructive because it disregards the district court's denial of Defendant's motion for a new trial on these grounds which is the focus of our review. Thus, the Court interprets the above question presented as whether the district court abused its discretion by denying the motion for a new trial because the jury's verdict was based upon passion and prejudice.

weight of the evidence." *McNabola*, 10 F.3d at 516.

On a motion to alter the judgment, the district court vacated the $350,000 compensatory damages award because Hasham failed to offer any testimony dealing with the question of compensatory damages such as physical or emotional injury other than lost earnings. Defendant attempts to bootstrap its contention that there was no evidence to support a finding of liability against CBOE on the trial judge's finding of a lack of evidence for compensatory damages. We disagree because, as previously discussed, the jury's liability verdict against the defendant is based on circumstantial evidence of pretext. Because the jury's liability verdict was grounded in evidence and testimony revealed at trial, Defendant has not established that the jury's verdict is against the weight of the evidence. Thus, we hold that there was no abuse of discretion by the trial judge in denying the motion for a new trial on liability.[22]

## IV. CONCLUSION

We agree with the district court's denial of Defendant's motions for a judgment as a matter of law and denial of Defendant's motion for new trial because the evidence presented at trial supports the jury's finding of intentional national-origin discrimination against Defendant. We also hold that the trial court did not abuse its discretion in its evidentiary rulings and jury instructions. The liability and amended damages judgment of the district court are

AFFIRMED.

---

22. Plaintiff's attorney also requests that this Court sanction Defendant for filing a frivolous appeal. Indeed, we are at a loss as to what basis in law supports Defendant's belief that the district court erred when it refused to admit a photograph, in which Zigelman was not even pictured, of his "minority" friends at his son's bar mitzvah as evidence of Zigelman's lack of discriminatory animus in promoting Plaintiff. Otherwise, by and large, Defendant's arguments are sufficiently based in law and fact.